IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DVONN REAUX,<br><br>Defendant. | Case No. 3:25-cr-121<br><br>Conspiracy to Commit Mail Fraud<br>18 U.S.C. § 1349<br>(Count One)<br><br>Mail Fraud<br>18 U.S.C. § 1341<br>(Counts Two and Three)<br><br>Aggravated Identity Theft<br>18 U.S.C. § 1028A<br>(Counts Four and Five)<br><br>Forfeiture Allegation |

**INDICTMENT**

THE GRAND JURY CHARGES THAT:

**INTRODUCTORY ALLEGATIONS**

At all times material to the Indictment, unless otherwise stated:

1.  Unemployment insurance (UI) is a joint state-federal program that is intended to provide temporary financial assistance to workers who become unemployed through no fault of their own and who meet certain eligibility requirements. Each state administers its own UI program according to guidelines established by federal law, and the Virginia Employment Commission (VEC) administers Virginia's UI program.

2.  The U.S. Department of Labor (DOL) funds administrative costs related to the UI program for VEC. The federal UI trust fund finances the costs of administering UI programs, loans made to state UI funds, and half of extended benefits during periods of high unemployment. States can borrow from the federal UI trust fund if their own reserves are insufficient.

3.  UI benefits are funded primarily through federal and state employer payroll taxes,

which are assessed based on information reported by employers, including wage reports listing, among other items, individual employees and the wages they were paid in each calendar year quarter. Employers are required to remit unemployment tax payments based on the amount of gross wages reflected in these quarterly wage reports. VEC maintains records of those reports.

4. Virginians who have lost their jobs can apply to VEC to receive UI benefits. To be eligible for Virginia UI benefits, claimants must have had their hours reduced by their employer or been separated from employment altogether. Once VEC approves a claim, the claimant must re-certify unemployment status on a weekly basis. Claimants must also certify that they are ready, willing, and able to work each day during the weeks they are claiming UI benefits. If a claimant meets these requirements, including having received a sufficient amount of wages (as reported by their former employer) prior to separation, they become eligible to receive UI benefits.

5. VEC receives and processes applications for UI benefits through its website. Such applications must include the claimant's personal identifying information (PII), including their name, date of birth, Social Security number, address, and phone number, among other information.

6. After VEC processes and authorizes the claim, a financial institution, pursuant to a contract with VEC, receives and disburses the authorized benefits, either by direct deposit into the account the claimant designates to receive such funds or onto a prepaid debit card mailed to the address included in the claimant's UI application.

7. In instances where the claimant elects to receive UI benefits through a prepaid debit card, VEC UI benefits are credited to prepaid debit cards issued by Comerica, Inc., pursuant to a contract between VEC and Comerica's account servicer, Conduent, Inc.

8. Once the initial claim is approved, the claimant can then file to receive benefits on a weekly basis by certifying online that they remain unemployed and eligible for benefits. VEC

receives and processes these certifications through its website. Based on the claimant's certifications, VEC will continue to authorize payment of available UI benefits as described above. Prepaid cards are automatically reloaded with newly disbursed funds via electronic transfers.

9. VEC mails prepaid debit cards via the United States Postal Service (USPS). Each such card bears a unique card number alongside the claimant's name. This information, alone and in conjunction, is a means of identifying the claimant, as defined by 18 U.S.C. § 1028(d)(7), and an access device, as defined by 18 U.S.C. § 1029(e)(1).

10. In instances where a claimant requests direct deposit of benefits, VEC initiated an Automated Clearing House transfer of funds from its server in Sandston, Virginia, which is within the Eastern District of Virginia, to a SunTrust Bank server located in Atlanta, Georgia, instructing SunTrust to move money from the VEC Trust Fund account to a VEC Payments Account. SunTrust then created electronic transfers to the claimant direct deposit account on file.

11. Only UI benefits can be credited to the prepaid debit cards issued by VEC. Claimants can use such cards to make point-of-sale and retail purchases. Claimants can also transfer UI funds from those cards to another account and withdraw them in cash at automated teller machines (ATMs).

**I.   EXPANSION OF UI BENEFITS DUE TO COVID-19 PANDEMIC**

12. On March 13, 2020, the President of the United States declared a national emergency recognizing the threat that the novel coronavirus, known as SARS-CoV-2, and COVID-19, the disease caused by SARS-CoV-2, posed to the nation's healthcare systems. The President also determined that same day that the COVID-19 outbreak constituted an emergency of nationwide scope, pursuant to section 50l(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act), 42 U.S.C. § 5191(b).

13. On March 18, 2020, the President of the United States signed into law the Families First Coronavirus Response Act, which provided additional flexibility for state UI agencies and additional administrative funding to respond to the COVID-19 pandemic.

14. The Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law on March 27, 2020. It expanded states' ability to provide UI benefits for many workers impacted by the COVID-19 pandemic, including workers who are not ordinarily eligible for regular UI benefits.

15. Specifically, the CARES Act created the Pandemic Unemployment Assistance (PUA) program. Under PUA, states were permitted to provide UI benefits during the COVID-19 pandemic to individuals who do not qualify for regular UI benefits, including business owners, self-employed workers, independent contractors, those seeking part-time employment, and those with a limited work history who were out of business or had significantly reduced their services as a direct result of the pandemic.

16. To qualify for PUA benefits, an individual must not have been eligible for regular UI benefits and must be unemployed, partially unemployed, or unable or unavailable to work because of certain specified health or economic consequences of the COVID-19 pandemic.

17. The CARES Act also established the Pandemic Emergency Unemployment Compensation (PEUC) program. PEUC covered most individuals who exhausted all rights to regular UI compensation under state or federal law and who were able to work, available for work, and actively seeking work as defined by state law. PEUC also gave states the flexibility to determine whether an individual was actively seeking work if the individual is unable to search for work because of COVID-19, including because of illness, quarantine, or movement restrictions.

18. Finally, the CARES Act also established the Federal Pandemic Unemployment Compensation (FPUC) program. FPUC allowed states to give an additional $600 per week to individuals collecting regular UI compensation, PEUC, PUA, and other approved state programs. FPUC benefits expired on July 31, 2020.

19. On April 18, 2020, the President further declared that a major disaster existed in all States and territories as a result of COVID-19, pursuant to section 401 of the Stafford Act, 42 U.S.C. § 5170.

20. On August 8, 2020, to further offset the pandemic's impact on American workers, the President authorized the Federal Emergency Management Agency (FEMA) to expend up to $44 billion from the Disaster Relief Funds for lost wage payments, in accordance with section 408(e)(2) of the Stafford Act, 42 U.S.C. § 5174(e)(2). The President authorized the FEMA Administrator to provide grants to participating states, territories, and the District of Columbia to administer delivery of lost wages assistance (LWA) to those receiving UI benefits. For example, in the Commonwealth of Virginia the LWA provided an additional $300 per week to claimants who were eligible for at least $100 week in UI compensation. LWA remained available until the authorized funds were expended in or about December 2020.

### The Defendant and Other Individuals

21. At all times relevant to the Indictment, Co-Conspirator 1 was incarcerated at Fluvanna Correctional Center (Fluvanna Center) in Troy, Virginia.

22. DVONN REAUX, a resident of Richmond, Virginia, located within the Eastern District of Virginia, filed numerous UI claims for incarcerated prisoners.

### COUNT 1
(Conspiracy to Commit Mail Fraud)

23. The allegations in paragraphs 1 through 22 of this Indictment are re-alleged and

5

incorporated as though set forth in full here.

## Scheme & Artifice to Defraud

24. Beginning from in or about April 2020 through in or about October 2020, in the Eastern District of Virginia, the defendant, DVONN REAUX, knowingly and unlawfully conspired with Co-Conspirator 1 and others, known and unknown, to commit an offense contained within Chapter 63 of Title 18 of United States Code, to wit: to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice, and attempting to do so, knowingly caused to be delivered by mail, according to the direction thereon, certain mail matters, in violation of Title 18, United States Code, Section 1341.

## Object of the Conspiracy to Commit Mail Fraud

25. The object of the mail fraud conspiracy was for Co-Conspirator 1 to procure and transfer the PII of other inmates incarcerated at Fluvanna Center to REAUX, for the purpose of filing fraudulent UI claims for those incarcerated prisoners, who were ineligible to receive UI benefits. REAUX and Co-Conspirator 1 would utilize those fraudulently obtained UI proceeds for their own purposes, and distributed portions of the fraudulently obtained UI proceeds to multiple individuals, including some of the prisoners whose PII REAUX and Co-Conspirator 1 had obtained and utilized, as well as the friends and family members of these prisoners.

## Manner and Means of the Conspiracy

The manner and means by which the conspirators carried out the objects of the conspiracy included, but were not limited to, the following:

26. From in or about April 2020, through in or about October 2020, REAUX and Co-Conspirator 1 agreed to work together to file for fraudulent UI benefits. On a recorded jail call on

6

July 7, 2020, REAUX informed Co-Conspirator 1 that REAUX had filed a UI claim on Co-Conspirator 1's behalf. After REAUX submitted a UI claim on Co-Conspirator 1's behalf, Co-Conspirator 1 began passing REAUX the personal identifying information of other inmates for the purpose of facilitating REAUX's filing of UI claims for those incarcerated individuals, both with and without the knowledge of those other inmates. Co-Conspirator 1 and REAUX both knew and understood that these prisoners were not able and available to work because they were incarcerated, and that as such, they were not entitled to UI funds.

27. On a recorded jail call on July 15, 2020, Co-Conspirator 1 reported to REAUX that Co-Conspirator 1 had three more inmates that wanted UI claims filed in their names. Co-Conspirator 1 then gave to REAUX the personal identifying information of three inmates, and the conspirators discussed REAUX depositing money into Co-Conspirator 1's prison account. Two of the three inmates Co-Conspirator 1 and REAUX discussed had UI applications filed on their behalf from an Internet Protocol (IP) address belonging to REAUX. REAUX also used this same IP address to make a $150 deposit to Co-Conspirator 1's prison account on or about July 15, 2020.

28. On another call on July 15, 2020, Co-Conspirator 1 reported to REAUX that Co-Conspirator 1 had the personal identifying information of another inmate and proceeded to put that female inmate on the phone, who passed along to REAUX her personal identifying information, which PII was used to file a UI claim two days later from REAUX's IP address.

29. On July 16, 2020, Co-Conspirator 1 emailed REAUX the personal identifying information of three other inmates. Two of these inmates had UI applications filed on their behalf from REAUX's IP address on or about July 22, 2020.

30. On July 21, 2020, Co-Conspirator 1 gave REAUX, during a recorded jail call, the personal identifying information of two other inmates. One of these inmates had UI applications

7

filed on her behalf from REAUX's IP address on or about July 24, 2020.

31. On July 22, 2020, Co-Conspirator 1 emailed REAUX the personal identifying information of one other inmate. This inmate had a UI application filed on her behalf from REAUX's IP address on or about July 24, 2020.

32. In total, Co-Conspirator 1 gave REAUX the personal identifying information of eight individuals—and including Co-Conspirator 1 herself, nine identities—for the purpose of REAUX using those identities to file fraudulent UI claims. In addition to the identities collected and provided by Co-Conspirator 1, REAUX filed an additional 31 claims for inmates, resulting in the disbursement by the United States Government of approximately $313,476 in fraudulently obtained benefits.

33. The UI applications REAUX filed for incarcerated individuals contained numerous false statements. For example, the applications REAUX filed for Co-Conspirator 1 and inmates D.H. and J.S. stated that those inmates' residential address was in Richmond, Virginia; that they were currently looking for work; that they could accept a job if one were offered that day; and that the information in the application was "true to the best of my knowledge. I UNDERSTAND THAT THE LAW PROVIDES FOR FINES OR IMPRISONMENT OR BOTH IN ADDITION TO DISQUALIFICATION AND REPAYMENT OF BENEFITS IF I KNOWINGLY FAIL TO DISCLOSE INFORMATION OR GIVE FALSE INFORMATION IN ORDER TO OBTAIN OR INCREASE BENEFITS."

34. Knowing the aforementioned statements to be untrue, REAUX submitted the UI applications from REAUX's home in Richmond, Virginia.

35. REAUX, filing fraudulent UI applications from the IP address connected to his home in Richmond, Virginia, elected to have the Way2Go debit cards containing benefit payments

mailed to 807 East 36th Street, Apartment A, Richmond, Virginia 23224, which is within the Eastern District of Virginia. REAUX listed this mailing address on numerous UI applications filed from his IP address.

36. The aforementioned violation occurred in relation to, and involving a benefit authorized, transported, transmitted, transferred, disbursed, and paid in connection with a presidentially declared major disaster and emergency as those terms are defined in section 102 of the Stafford Act.

**COUNTS 2 - 3**
(Mail Fraud)

37. The allegations in paragraphs 1 through 36 of this Indictment are re-alleged and incorporated as though set forth in full here.

38. From in or about April 2020, through in or about October 2020, in the Eastern District of Virginia and within the jurisdiction of this court, the defendant, DVONN REAUX, with the intent to defraud, devised, with knowledge of its fraudulent nature the above-described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises. For the purpose of executing this scheme, and attempting to do so, the defendant knowingly caused to be delivered by mail, according to the direction thereon, the following matters, each mailing constituting a separate count of the Indictment:

| Count | Date (On or About) | Inmate Initials | Description of Execution |
|---|---|---|---|
| 2 | July 24, 2020 | D.H. | REAUX submitted an unemployment insurance application for the inmate D.H. that contained numerous false and fraudulent statements, as described above. As a result of this fraudulent filing, the VEC facilitated the mailing of a Way2Go debit card containing UI funds to the Richmond, Virginia mailing address designated by the conspirators on the fraudulent UI application. |

| Count | Date (On or About) | Inmate Initials | Description of Execution |
|---|---|---|---|
| 3 | July 24, 2020 | J.S. | REAUX submitted an unemployment insurance application for the inmate J.S. that contained numerous false and fraudulent statements, as described above. As a result of this fraudulent filing, the VEC facilitated the mailing of a Way2Go debit card containing UI funds to the Richmond, Virginia mailing address designated by the conspirators on the fraudulent UI application. |

(All in violation of Section 1341 of Title 18 of the United States Code).

## COUNTS 4 - 5
(Aggravated Identity Theft)

39. The allegations in paragraphs 1 through 38 of this Indictment are re-alleged and incorporated as though set forth in full here.

40. From in or about April 2020, through in or about October 2020, in the Eastern District of Virginia and within the jurisdiction of this court, the defendant, DVONN REAUX, did knowingly and unlawfully possess and use, without lawful authority, means of identification of other persons (as set forth in more detail below), knowing that the means of identification belonged to another actual person, during and in relation to a felony violation contained in Chapter 63 of Title 18, United States Code (that is, Mail Fraud, in violation of 18 U.S.C. Section 1341), each such violation constituting a separate count of the Indictment:

| Count | Date (On or About) | Inmate Initials | Description of Execution |
|---|---|---|---|
| 4 | July 24, 2020 | D.H. | REAUX submitted an unemployment insurance application for the inmate D.H., which contained D.H.'s name, date of birth, and Social Security number, which resulted in the mailing described in Count 2. |
| 5 | July 24, 2020 | J.S. | REAUX submitted an unemployment insurance application for the inmate J.S., which contained J.S.'s name, date of birth, and Social Security number, which resulted in the mailing described in Count 3. |

(All in violation of Section 1028A of Title 18 of the United States Code).

10

## FORFEITURE ALLEGATION

Pursuant to Rule 32.2(a) Fed. R. Crim. P., defendant, DVONN REAUX, is hereby notified that upon conviction of any of the offenses alleged in Counts One through Three of this Indictment, they shall forfeit to the United States any property, real or personal, which constitutes or is derived from any proceeds traceable to the offense.

The property subject to forfeiture includes, but is not limited to the following:

> A sum of money of at least $313,476, which represents the proceeds of the offenses charged and which shall be reduced to a money judgment against the defendant in favor of the United States.

If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets, pursuant to 21 U.S.C § 853(p).

(All in accordance with Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461, and Title 21, United States Code, Section 853(p)).

A TRUE BILL:

_____ 7/22/25
FOREPERSON

ERIK S. SIEBERT
UNITED STATES ATTORNEY

By: _____
Shea Matthew Gibbons
Assistant United States Attorney

11